## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**KEVIN ALLEN BAINBRIDGE,**

     **Plaintiff,**

**vs.**                                **CIVIL ACTION NO. 2:16-CV-00226**

**NANCY A. BERRYHILL,[1]**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

     **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. By Order entered January 14, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 16 and 19.)

The Plaintiff, Kevin Allen Bainbridge (hereinafter referred to as "Claimant"), protectively filed his application for Title XVI benefits on September 7, 2012, alleging disability since July 31,

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2007[2] due to "ptsd, adhd, back pain, bipolar".[3] (Tr. at 316.) His claim was denied initially on January 22, 2013 (Tr. at 188-192.) and again upon reconsideration on April 19, 2013. (Tr. at 198-200.) Thereafter, Claimant filed a written request for hearing on May 9, 2013. (Tr. at 201-203.) An administrative hearing was held on August 26, 2014 before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 106-144.) By decision dated September 11, 2014, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 88-105.) On October 14, 2014, Claimant sought review by the Appeals Council of the ALJ's unfavorable decision and requested additional time to submit new and material evidence. (Tr. at 87.) The Appeals Council granted Claimant's request for more time on March 18, 2015. (Tr. at 8-11.) Subsequently, the ALJ's decision became the final decision of the Commissioner on November 30, 2015 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-5.) On January 12, 2016, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

---

[2] Claimant previously filed a claim for SSI that was denied on February 14, 2012 that he did not appeal. (Tr. at 183-187.) In the instant action, the adjudicator presumed Claimant's alleged onset date implied a request to reopen the prior application, however, finding no basis to do so, the pending matter is restricted to Claimant's disability status from September 7, 2012, though the complete medical history was considered. (Tr. at 91.)

[3] In his Disability Report – Appeal, dated May 20, 2013, Claimant alleged that since approximately April 1, 2013, he was "[h]aving more mood swings" and that his "[m]oods were worsening." (Tr. at 363.)

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 416.920(f). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA

rates and documents the degree of functional limitation resulting from the impairment according

to criteria as specified in 20 C.F.R. § 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA

determines their severity. A rating of "none" or "mild" in the first three functional areas (activities

of daily living; social functioning; and concentration, persistence, or pace) and "none" in the fourth

(episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless

evidence indicates more than minimal limitation in the claimant's ability to do basic work

activities. Id. § 416.920a(d)(1).[4] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 416.920a(e)(4).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the application date, September 7, 2012. (Tr. at 93, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: sciatica; osteoarthritis of the right hand; cognitive disorder;

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

generalized anxiety disorder/posttraumatic stress disorder; bipolar disorder; and alcohol dependence in remission. (Id., Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 94, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform medium work as defined in the Regulations that

> Requires no more than occasional forceful gripping/twisting with the right hand, and no more than frequent handling or fingering with the right hand; requires no more than uninvolved 3 to 4 step tasks; requires no interaction with the public; and requires no work with close coordination with others in a team type approach such as tandem work. (Tr. at 95, Finding No. 4.)

At step four, the ALJ found that Claimant was incapable of performing his past relevant work. (Tr. at 99, Finding No. 5.) At the fifth step, the ALJ determined the following: that Claimant was 55 years old, making him an individual closely approaching advanced age as of the application date, but then subsequently changed age category to advanced age; that he had the equivalent of a high school education and could communicate in English; that the transferability of job skills was immaterial to the determination of disability; and that based on Claimant's age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that Claimant could perform. (Id., Finding Nos. 6-9.) On this basis, the ALJ determined Claimant was not under a disability since September 7, 2012. (Tr. at 100, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be

6

somewhat less than a preponderance. If there is evidence to justify a refusal to direct
a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 57 years old on the date of the ALJ's decision, making him a "person of advanced age". See 20 C.F.R. § 416.963(e). Claimant completed the tenth or eleventh grade, but obtained his GED since then, in 1994. (Tr. at 113, 317.) Claimant last worked as a cook in a restaurant on December 15, 2011. (Tr. at 316, 317.)

Issues on Appeal

Claimant has alleged two main grounds in support of his appeal: (1) that the ALJ erred by failing to properly weigh his treating psychiatrist's opinion; and (2) that the ALJ ignored objective evidence and failed to find degenerative disc disease as a severe impairment. (Document No. 16 at 10.)

The Relevant Evidence of Record[5]

_____

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings. Claimant submitted additional medical record evidence to the Appeals Council after the date of the ALJ's decision (Tr. at 15-86.), however, this evidence is unrelated to the issues raised in this

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Evidence Pertaining to Physical Impairments:

On September 25, 2011, Claimant sought emergency care for right wrist pain that he described as a ten on a ten scale. (Tr. at 435.) He was diagnosed with acute exacerbation of right hand pain with decreased ability to flex dominant right hand fourth and fifth and provided with pain medication. (Tr. at 436.)

On February 1, 2012, Claimant was evaluated by Nilima Bhirud, M.D., at the request of DDS. (Tr. at 404-406.) Claimant reported a 43-year history of back pain that he described his pain as "constant" from performing years of manual labor since he was seven years old. (Tr. at 404.) Dr. Bhirud noted that Claimant had never been to a neurosurgeon, never been to a pain clinic, and never had physical therapy. (Id.) He reported being able to stand "for 15-20 minutes at a time" and sit "15 minutes at a time" and "walk a few blocks at a time today." (Id.) On physical examination, he could not toe walk or squat, or walk in tandem gait, but could pick up a pen from the floor; stand on each foot separately; walk on his heels; could flex the lumbar spine forward to 70 degrees; and was comfortable in both sitting and standing positions. (Tr. at 405.) Claimant had normal feet and did not use an ambulatory aid. (Id.) Dr. Bhirud observed a normal lumbar spine; a normal gait other than walking in tandem gait; moderate tenderness in his lumbar spine and C-spine with decreased range of motion in both; and a positive straight leg-raising test at 70 degrees bilaterally. (Tr. at 406.) Claimant's grip was described as "poor" in both hands. (Id.) Decreased range of motion was noted in Claimant's hips, and swelling and decreased range of motion was noted in

appeal and further, Claimant raises no arguments with reference to the Appeals Council, but only with respect to the ALJ's decision below.

his left knee. (Id.)

A second consultative evaluation was performed on January 8, 2013 by Dr. Kip Beard at the request of DDS. (Tr. at 457-462.) Claimant reported gradually worsening lower back pain exacerbated by some car accidents over the years, and wore an elastic back brace to the examination. (Tr. at 457, 459.) Claimant reported flares in pain that cause him to have to crawl to the bathroom at times. (Tr. at 457.) He reported medication and steaming bathwater assisted with pain. (Id.) He also complained of fatigue. (Id.)

Dr. Beard observed that Claimant had no ambulatory aids and required no ambulatory aids, although he walked with a "mildly stiff appearing gait." (Tr. at 459.) Claimant rose from a seated position and stepped up and down from the examination table without obvious difficulty. (Id.) Claimant appeared mildly uncomfortable due to back pain when lying down, and appeared comfortable while seated. (Id.) Dr. Beard ordered lumbar spine x-rays which revealed mild anterior spurring at L1-2, mild disc narrowing and slight anterior spurring at L4-5, and marked disc narrowing with endplate sclerosis and mild anterior spurring at L5-S1. (Tr. at 463.)

On physical examination, Claimant mild discomfort when forward bending to 70 degrees with some paravertebral tenderness, but had normal range of motion otherwise. (Tr. at 460.) He was able to heel-walk, toe-walk, tandem walk, and squat. (Tr. at 461.) Claimant could stand on one leg alone without difficulty, and had a negative straight leg-raising test bilaterally that produced no complaints when seated, but produced some mild back pain when lying down. (Tr. at 460-461.)

Dr. Beard noted Claimant's cervical spine revealed some mild stiffness on range of motion testing. (Tr. at 460.) There was "some AC crepitus at both shoulders." (Id.) Examination of the left

knee showed "some palpable ridging of the medial joint margin" and "mild intermittent crepitus . . . with pain and tenderness . . . with normal range of motion." (Id.) Dr. Beard noted that the crepitus was consistent with osteoarthritis following Claimant's history of three prior left knee surgeries. (Tr. at 462.) Dr. Beard's final impression included chronic low back pain with bilateral lumbar radicular symptoms and reported degenerative disk disease and sciatica, fatigue from unknown etiology and reported prior positive serology for hepatitis B with negative follow up serology and osteoarthritis with history of three prior left knee surgeries. (Tr. at 461.)

On January 16, 2013, Rogelio Lim, M.D., a state agency physician, reviewed the medical and non-medical evidence of record and found a non-severe spine disorder, but restricted Claimant to medium work with standing and/or walking for about 6 hours in an 8-hour workday, and sitting about 6 hours in an 8-hour workday. (Tr. at 161, 163-164.) Dr. Lim found Claimant's allegations not fully credible; despite his reports for back pain, there was no evidence of nerve root compression, no neurological findings, and no myelopathy. (Tr. at 164.) Dr. Lim opined that Claimant's allegations were out of proportion to the objective findings relating to his back (Id.) On January 22, 2013, state agency physician James Egnor, M.D., reviewed the medical and other evidence of record and "generally agree with the RFC as written" insofar that Claimant's impairments reduced his RFC to medium work; he also noted Claimant's prior work history "was light and near sedentary." (Tr. at 556.)

On April 11, 2013, at the reconsideration level of review, Curtis Withrow, M.D. reviewed the evidence and noted that Claimant had no new complaints or changes in daily activities since the initial level of review (Tr. at 174.); Dr. Withrow found a non-severe spine disorder, and agreed that Claimant could perform medium work. (Tr. at 175, 177.)

On January 10, 2014, Claimant presented to CAMC hospital for abdominal pain and diarrhea after unknowingly consuming and bathing in the contaminated water in Kanawha County. (Tr. at 623.) On April 26, 2014, Claimant again presented to CAMC complaining of sinus drainage and staggering/imbalance. (Tr. at 626.) However, the attending physician observed Claimant walking in the hall with a normal gait and no sign of any imbalance. (Id.) On physical examination, Claimant moved all extremities well. (Tr. at 627.) The physician prescribed an antibiotic. (Id.) Claimant returned two weeks later reporting improved symptoms with the exception of his unsteady gait. (Tr. at 629.) Recent blood work was essentially unremarkable. (Id.) On examination, Claimant veered to the right, but he could heel and toe walk, and walk in a straight line without difficulty. (Tr. at 630.) He also had an appropriate mood and affect. (Id.) The attending physician ordered a CT scan of Claimant's head, which was unremarkable. (Tr. at 632.)

Evidence Relating to Mental Impairments:

Claimant arrived by ambulance to Thomas Hospital on April 14, 2011 due to suicidal thoughts and angry, aggressive behavior. (Tr. at 394-403.) He had previously consumed alcohol and all drug tests were negative. (Tr. at 394.) On mental status examination, Claimant had normal mood, affect, speech, cognition, thought process, insight, and judgment. (Id.) He had no motor deficits and normal reflexes. (Id.)

Claimant presented to Prestera Center on September 23, 2011 reporting complaints of racing thoughts, poor sleep with anger and temper outbursts, and excessive energy; the loss of his home lead to suicidal ideation prompting him to come in for services. (Tr. at 465, 514.) He reported witnessing his father rape his sister and almost beat his brother to death as a child; he also reported having several arrests for assault in the past, the last of which occurred in 1994. (Tr. at 465.)

Providers noted that he needs treatment for mania, racing thoughts, poor sleep, anger outbursts, poor memory and PTSD symptoms. (Id.) The intake clinician recommended a psychiatric evaluation and therapy, however, Claimant was not interested in therapy at that time. (Tr. at 466.) He was diagnosed with bipolar disorder not otherwise specified and posttraumatic stress disorder. (Tr. at 467.) His GAF was 65.[6]  (Tr. at 468, 518.)

Claimant returned on October 3, 2011 for a psychiatric evaluation with Dr. Elizabeth McClellan[7] on October 3, 2011. (Tr. at 469.) He reported that he and his wife recently moved into a homeless shelter due to economic problems, at which time he quit drinking because it was not permitted at the shelter. (Id.) Claimant continued to complain of excessive energy, irritability, poor impulse control and sleep. (Id.) His affect was constricted, his speech rapid and pressured, and he was noted for flight of ideas. (Tr. at 470.) His prognosis was considered to be fair. (Id.) He reported that mental illness, particularly bipolar and uncontrolled anger, is rampant in his family history. (Tr. at 531.) Dr. McClellan started Claimant on Seroquel 50 mg and Valium 10 mg. (Tr. at 470.) His diagnoses included bipolar, most recent episode mixed, moderate, alcohol-related disorder, alcohol dependence early partial remission, PTSD and ADHD, combined type. (Tr. at 471.) His GAF was 50.[8] (Id.)

By October 11, 2011, Claimant complained that neither Seroquel nor Valium were helping him, and he was concerned that he would "fight and knock out anyone who challenges him." (Tr.

---

[6] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 61-70 indicates that the person has "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).
[7] The undersigned notes that Dr. McClellan was a staff physician at Prestera Center.
[8] A GAF of 41-50 indicates that the person has "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

at 483.) He had a labile affect and hyperactive motor activity, but otherwise normal mental status. (Tr. at 484.) His GAF remained at 50. (Tr. at 485.) Dr. McClellan discontinued Seroquel and Valium, and started Claimant on Lamictal 25 mg, Trazodone 50 mg, Thlamine 100 mg, and Folic acid 1 mg. (Tr. at 485-486.)

On October 25, 2011, Claimant reported sleeping better with Trazadone and started working at Lone Star restaurant as a cook, which only lasted a few days due to conflict. (Tr. at 487.) He also reported having conflict with people at the homeless shelter, but was working with Housing and Urban Development to obtain housing. (Tr. at 487, 490.) Dr. McClellan's examination revealed a labile affect, pressured speech, and flight of ideas, but normal appearance, sociability, and recall memory; appropriate eye contact; and improving coping ability. (Tr. at 487-488.) His GAF remained at 50. (Tr. at 489.) Dr. McClellan asked Claimant to increase his Lamictal dose in a week and to continue Trazodone. (Tr. at 490.)

During a medication management appointment on November 8, 2011, Claimant reported to Dr. McClellan that his current medications were working well. (Tr. at 491.) He and his wife were still living in the homeless shelter while their housing application with HUD was still being processed, however, Claimant reported he and his wife were working. (Id.) Other than hyperactivity, his mental status examination was normal. (Tr. at 491-492.) Dr. McClellan continued his Seroquel and Trazodone, and decreased his Valium dose. (Tr. at 493-494.)

On December 6, 2011, Claimant reported having continued irritability and poor impulse control. (Tr. at 495, 548.) He had been offered a job, but was afraid to take it due to his symptoms. (Id.) He reported that he was sleeping "OK", and going to group therapy every Thursday. (Id.) On mental status examination, he was noted to have a labile affect, disinhibited sociability, rapid

13

speech, and some hyperactive motor activity, but an otherwise normal examination. (Tr. at 495-496, 548-549.) His GAF remained at 50 and his continued sobriety was noted. (Tr. at 497, 550.) Dr. McClellan made no medication adjustments. (Tr. at 497-498, 550-551.)

By December 20, 2011, Claimant advised Dr. McClellan that he was filing for disability because "he has such a bad temper that he is unable to be employed because he doesn't know when he'll go off and get violent." (Tr. at 499.) Dr. McClellan's mental status examination indicated that Claimant had deficient coping skills and she observed him to have a disheveled appearance, but he had normal sociability, speech, thought content, orientation, recall memory, affect, and eye contact. (Tr. at 499-500.) Dr. McClellan did not adjust Claimant's medications. (Tr. at 501-502.)

During a February 6, 2012 follow-up appointment, Claimant reported to Dr. McClellan that he moved out of the shelter and into his own house. (Tr. at 503.) He remained abstinent from alcohol, but continued to report agitation and anger outbursts. (Id.) On mental status examination, Claimant was noted to be fidgety and slightly hyperactive and having flight of ideas, but with improving coping ability, normal recall memory, labile affect, and appropriate eye contact. (Tr. at 503-504.) Dr. McClellan stopped Trazodone, started Tegretol 200 mg, and continued Seroquel. (Tr. at 505-506.)

By March 5, 2012, Claimant reported to Dr. McClellan that he is having conflicts with his landlord, but that he and his wife were getting along. (Tr. at 507.) He reported not starting Tegretol but wanted to restart Trazodone to help him sleep. (Id.) He also stated that Seroquel helped stabilize his mood. (Id.) On mental status examination, Claimant had rapid speech, flight of ideas, and a labile affect, but appropriate eye contact; normal appearance; sociability; and recall memory; and improving coping ability. (Tr. at 507-508.) Dr. McClellan restarted Claimant on Trazodone, and

continued Seroquel and Valium. (Tr. at 510.) She also recommended that Claimant call 911 if the conflict with his landlord escalated. (Id.)

When Claimant followed up with Dr. McClellan in April 2012, he reported that he was in Michigan for a while caring for his ailing grandmother. (Tr. at 523.) He was discontinued on Trazodone due to side effects, but his mood was improved and stable. (Id.) Although he was observed to have a disheveled appearance, he interacted well with others; had an appropriate affect; had a euthymic mood; reported adequate sleep and appetite; had normal stream of thought; had appropriate thought content; and denied suicidal or homicidal thoughts. (Tr. at 524.)

June 11, 2012 records show that Claimant was doing well, he had improved self-esteem, decreased irritability, a job and his own apartment, and a stable mood; he was started on Thiamine. (Tr. at 519.) Dr. McClellan noted that he continued to abstain from alcohol. (Id.) His mental examination was normal. (Tr. at 520-521.) Dr. McClellan scored his GAF at 65. (Tr. at 522.)

By July 30, 2012, Claimant reported to Dr. McClellan that he still had some difficulty sleeping at times, but otherwise stable on his current medications. (Tr. at 511.) On mental status examination, he had an appropriate appearance; normal eye contact; a cooperative and pleasant attitude; normal and calm motor activity; normal speech; an "ok" mood; an appropriate affect; goal-directed, logical, and relevant thought processes; appropriate thought content; and good orientation. (Id.) Dr. McClellan assigned him a GAF score of 60, and made no medication adjustments.[9] (Tr. at 512-513.)

Records signed by Jessica Hamilton, B.A., dated August 3, 2012 from Prestera show

---

[9] A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." Id.

"moderate" symptoms of depression with several other mild symptoms. (Tr. at 478.) Records from CAMC dated August 23, 2012 indicate that Dr. McClellan ordered a routine drug screen on Claimant; the results were negative. (Tr. at 418.)

During a follow-up appointment with Dr. McClellan on September 25, 2012, Claimant reported doing well on his medications. (Tr. at 571.) His mental status examination was normal. (Id.) Dr. McClellan assigned him a GAF at 60 and his medications were continued. (Tr. at 573.)

On December 21, 2012 records show that Claimant continued to do well on medications. (Tr. at 525.) Dr. McClellan's mental status examination was normal: Claimant had an appropriate and well-groomed appearance; had normal eye contact; was cooperative and pleasant; had normal and calm motor activity; had normal speech; had an "ok" mood; had an appropriate affect; reported no hallucinations; had goal-directed, logical, and relevant thought processes; had appropriate thought content; and was alert and oriented times four. (Id.) Dr. McClellan rated his GAF at 60, continued Trazodone and Valium, and decreased Seroquel per Claimant's request. (Tr. at 525, 527.)

On December 31, 2012, Kara Gettman-Hughes, M.A. performed a consultative examination of Claimant at the request of DDS. (Tr. at 447-455.) Claimant reported feeling angry and impulsive with excessive worry and poor memory; he also complained of depression, loss of interest, impaired sleep, fatigue, guilt, cognitive deficits, and racing thoughts. (Tr. at 448.) He numerous arrests for assault and that he has been "in and out of prison all my life". (Tr. at 450.) He reported leaving his job as a cook at Lone Star restaurant after only four days due to anger issues. (Tr. at 448.) He also reported completing the eleventh grade and being retained in the first grade. (Tr. at 450.) Although Claimant admitted to a long history with alcohol use, he denied using

16

alcohol over the last year. (Tr. at 449.) He also reported requiring assistance getting dressed when his sciatic pain is severe and showers only once per week. (Tr. at 453-454.)

Ms. Gettman-Hughes administered IQ testing that revealed the following: verbal comprehension 76; perceptual reasoning 77; working memory 80; processing speed 79; full scale 73; the results were valid. (Tr. at 450.) His general cognitive ability was rated as borderline range of intellectual functioning with his overall thinking and reasoning ability exceeding four percent of individuals his age. (Tr. at 451.) Valid Cognistat scores showed "severe impairment" with memory. (Id.) An analysis of the test results indicated that Claimant experienced difficulties recalling new information, which was consistent with his reported deficits. (Tr. at 452.) Ms. Gettman-Hughes found that "he appears to have some problems sustaining attention to task, particularly when multitasking." (Id.)

On mental status examination, Claimant was observed to be: casually dressed with proper hygiene; cooperative during the evaluation; variable eye contact; verbose but responsive and coherent speech; oriented in all spheres, other than knowing the name of the interview location and the exact date; irritable mood and slightly restricted affect; circumstantial thought process, but no delusions or unusual perceptual experiences; mildly impaired judgment; poor insight; psychomotor agitation; mildly impaired concentration; moderately impaired persistence; normal pace; and severely impaired recent memory. (Id.) His social functioning was described as "moderately impaired"; Claimant indicated that he did not go to the store, rarely ran errands, and did not go to church or have any close friends. (Tr. at 452-453.) Claimant reported that his wife brought food home from a restaurant about twice per month; his daily activities primarily concern watching television. (Tr. at 453-454.)

17

Ms. Gettman-Hughes diagnosed bipolar disorder, not otherwise specified; generalized anxiety disorder; cognitive disorder, not otherwise specified, provisional; alcohol dependence in sustained full remission; and personality disorder, not otherwise specified with cluster A, B and C traits. (Tr. at 452-453.) His prognosis was "poor." (Tr. at 454.)

Claimant followed up with Dr. McClellan on January 21, 2013 stating that he was still doing well on his current medications. (Tr. at 528.) His mental status examination was normal. (Tr. at 528-529.) No medication adjustments were made; diagnoses listed at that time were: bipolar I disorder, most recent episode mixed, moderate with rapid cycling; alcohol related disorder not otherwise specified; alcohol dependence in early partial remission; PTSD; and ADHD. (Tr. at 530.)

Claimant returned to see Dr. McClellan on May 8, 2013 reporting some irritability and depression, but with no racing thoughts and ok sleep. (Tr. at 581.) The mental status examination was normal. (Id.) Prozac 20 mg was added and Seroquel was discontinued, and Trazodone and Valium were continued. (Tr. at 583.) Dr. McClellan gave Claimant a GAF score of 75.[10] (Id.)

During a July 15, 2013 medication check, Claimant reported "doing much better on Prozac, calmer" and wished to increase his dose. (Tr. at 585.) He further reported sleeping ok, no racing thoughts or mood swings. (Id.) His mental status examination was normal and Dr. McClellan recommended he continue Trazodone and Valium, and increased his Prozac dosage. (Tr. at 585-587.) His GAF remained at 75. (Tr. at 587.)

When Claimant returned on October 14, 2013, he reported some increased irritability and

---

[10] A GAF of 71-80 indicates that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork)."

that he increased his dosage of Prozac on his own with good results, with decreased irritability and improved mood. (Tr. at 589.) He said that his medications work for a few weeks and then he starts having symptoms again. (Id.) His mental status examination was normal; Dr. McClellan recommended that Claimant continue his Trazodone and Valium, and continue to take the increased Prozac dose. (Tr. at 589-591.) His GAF remained at 75. (Tr. at 591.)

On January 6, 2014, Claimant reported doing well except for difficulty sleeping. (Tr. at 593.) He reported that his mood was better on the increased Prozac, and had no racing thoughts or mood swings. (Id.) The mental status examination was normal. (Tr. at 593-594.) Dr. McClellan recommended an increase in Trazadone and that Claimant continue on the same dose of Prozac and Valium; his GAF score remained at 75. (Tr. at 595.)

During a follow-up appointment on March 31, 2014, Claimant reported that Prozac was no longer working and having trouble with irritability and mood swings, he also complained of ADHD. (Tr. at 597.) Claimant wanted to try Trileptal based on his daughter's positive response to the medication; it was noted he "denies drug/ETOH abuse." (Id.) Dr. McClellan recommended a decreased Prozac dose, increased dose of Trazadone, the same Valium dose and a trial of Trileptal. (Tr. at 599.) Dr. McClellan ordered blood testing and lab results from April 15, 2014 were positive for Benzodiazapines and THC. (Tr. at 604.)

During an April 28, 2014 medication check, Claimant reported that his irritability improved with Trileptal, "but wants to increase dosage which he has already been doing on his own." (Tr. at 610.) He reported that his wife noticed a "big improvement" with him on Trileptal, and that he had less irritability and mood swings and an improved mood. (Id.) His mental status examination was normal. (Tr. at 610-611.) Dr. McClellan increased Claimant's Trileptal dose and continued him on

Trazodone, Prozac and Valium. (Tr. at 612.)

During a May 19, 2014 follow-up appointment, Claimant wanted to increase his Prozac, he reported some continued depression and some irritability. (Tr. at 614.) He also complained that his shoulder was bothering him. (Id.) His mood was a little depressed, but otherwise, the remainder of the mental status examination was normal. (Tr. at 614-615.) Dr. McClellan rated his GAF at 75, increased his Prozac dose, and continued his other medications. (Tr. at 616.)

On June 24, 2014, Dr. McClellan completed a "Mental Assessment of Ability to Do Work-Related Activities". (Tr. at 607-609.) She noted that Claimant had "Extreme"[11] limitations in his ability to relate to co-workers, to interact with supervisors, to deal with work stresses, to behave in an emotionally stable manner, to relate predictably in social situations, and in his ability to complete a normal work day and work week without interruptions from psychologically based symptoms, as well as in his ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 608-609.) Dr. McClellan opined that Claimant had a marked[12] limitation in his ability to follow work rules and dealing with the public.[13] (Tr. at 608.) Dr. McClellan also assessed Claimant with a slight[14] limitation in functioning independently and understanding, and remembering, and carrying out detailed but not complex instructions, and no limitation in understanding, remembering, and carrying out simple job instructions or maintaining

---

[11] It is noted that the form defined the term "Extreme" as "[t]here is major limitation in this area. There is no useful ability to function in this area." (Tr. at 607.)

[12] The form defined the term "Marked" as "[t]he ability to function is severely limited and results in the inability to consistently and appropriately function from 1/3 to 2/3 of an eight hour work day or forty hour work week. (Tr. at 607.)

[13] The undersigned notes that Dr. McClellan also indicated that Claimant had "marked" limitations in his ability to interact with supervisors, deal with work stresses, and complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 608-609.)

[14] The form defined the term "Slight" as "[t]here are some mild limitations in this area, but the individual can function well. (Tr. at 607.)

his personal appearance. (Tr. at 608-609.) In support of her assessed limitations, Dr. McClellan explained that Claimant "has difficulty getting along with others, mood swings, violent episodes" and "has extreme mood swings with violent outbursts." (Id.)

On July 28, 2014, Claimant returned to Dr. McClellan and explained that he smoked marijuana to calm himself down; he was irritable and claimed Prozac was not helping. (Tr. at 618.) He further reported that he was seeking disability, and he was not interested in seeing a therapist. (Id.) Although it was noted that Claimant had an irritable mood and labile but appropriate affect, the remainder of the mental status examination was normal. (Tr. at 618-619.) Dr. McClellan discontinued Valium because "he has been smoking THC", decreased his Prozac dosage, continued on Trazodone and Trileptal, and started him on Abilify. (Tr. at 620.) His GAF was 65. (Id.)

August 26, 2014 records indicated that Claimant continued "to smoke THC and occasional Suboxone". (Tr. at 647.) Dr. McClellan noted that he had an irritable mood and labile but appropriate affect, but the remainder of the mental status examination was within normal limits. (Tr. at 647-648.) Dr. McClellan further noted that his gait was within normal limits. (Tr. at 648.) She continued Claimant's Trazodone, Prozac, and Trileptal, and discontinued Abilify. (Tr. at 649.) His diagnoses listed on that date included: bipolar disorder, mixed moderate; alcohol mental disorder; alcohol dependence in early partial remission; cannabis dependence; PTSD; and ADHD. (Tr. at 648-649.)

By October 17, 2014, Claimant reported continued irritability and mood swings, and that he was denied Social Security disability benefits; he wanted to increase his Trazodone dose. (Tr. at 651.) Dr. McClellan found his mental status examination the same as it was during the August

21

visit; she also continued him on the same medications. (Tr. at 648, 651.)

SSA Forms:

In forms completed in connection with his SSI application, Claimant indicated that he worked as a restaurant cook in 2003 and again in 2011 for one month; at an employment agency in 2005; and at a plumbing company from 2006 to 2007. (Tr. at 317, 324.) He indicated he last worked in December 2011. (Tr. at 316.) At the time of his application, he indicated he could not lift or bend, and did not work well with others. (Tr. at 346, 348.) He said he had difficulty bathing and dressing due to a nerve in his back. (Tr. at 347.) Claimant denied preparing any meals, performing household chores, shopping, or handling finances, stating that his wife did those things. (Tr. at 348-349.) He left his apartment 3 or 4 times per week, and used public transportation to travel. (Tr. at 349.) His hobbies included watching television, reading books and magazines, and talking on the phone. (Tr. at 350.)

The Administrative Hearing

Claimant Testimony:

Claimant testified that he lived with his wife and their 35-year-old son, who they take care of because he is schizophrenic. (Tr. at 113.) Claimant used to work as a self-employed auto mechanic; maybe once a month, he would look at people's cars and give them a diagnosis, but can no longer do the work due to his right hand and back. (Tr. at 114-115, 125.) He testified that his lack of patience and inability to interact with other people also prevents him from working. (Tr. at 126, 128.) Claimant also did some woodworking in his apartment, using a small jigsaw. (Tr. at 115-116.)

He testified he needed help from his wife to get out of bed and get dressed due to his

sciatica, but Claimant would not seek any medical treatment for his back pain, and refused to have surgery when suggested by a doctor because others have told him their pain was worse afterwards. (Tr. at 122-124.) Before seeing his doctor at Prestera, Claimant would self-medicate with beer; he has quit drinking since. (Tr. at 123-124.) Claimant testified that he gets mad easily, has little patience, and is forgetful. (Tr. at 126.) His wife has to leave him notes to remind him of his doctor appointments, even to come to the hearing. (Id.) Regarding the medications he is prescribed from Prestera, Claimant testified that they usually have to be adjusted within a six-week period, because they are no longer effective, though he still goes through mood swings. (Tr. at 127-128.)

Debra Bainbridge, Claimant's Wife Testimony:

Mrs. Bainbridge and Claimant have been married 28 years, but have been together almost 40 years. (Tr. at 130.) Over the last few years, 2012 – 2014, she testified that Claimant is still "hyper" despite being on medication, but is less "grouchy" since starting medication. (Tr. at 130-131.) Mrs. Bainbridge stated that Claimant has an anger outburst daily and has observed him to get into arguments with people on many occasions. (Tr. at 131-132.)

Cecilia Thomas, Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume an individual with Claimant's vocational profile who was limited to medium work requiring uninvolved 3 and 4 step tasks only; involved no interaction with the general public; and required no work in close coordination with others, like on a team or tandem work. (Tr. at 138.) Although such an individual could not perform Claimant's past work, the VE testified that the individual could perform the representative jobs of janitor/cleaner, landscaper/groundkeeper, and cleaner. (Tr. at 139-141.) Assuming that the individual was limited further to only occasional forceful gripping or twisting with the right hand, no more than frequent

handling and fingering with the right hand, the VE opined those jobs would remain. (Tr. at 141-142.) The VE testified that no jobs would be available if the individual would be expected to have verbal confrontations with coworkers or supervisors twice per month. (Tr. at 142.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

First, Claimant argues that the ALJ deviated from the Regulations by giving the opinion of Dr. McClellan, his treating physician, little weight, whereas he gave substantial weight to the opinions provided by state agency consultants. (Document No. 16 at 10-11.) Claimant further argues that Dr. McClellan's opinion was supported by ample evidence in the record: by her own treatment notes; by Claimant's own statements and testimony regarding his activities of daily living; and by consultative examiner, Kara Gettman-Hughes's findings. (<u>Id</u>. at 12-14.) Next, Claimant contends that the ALJ erred when he found his degenerative disc disease not a severe impairment because the x-ray ordered by Dr. Beard clearly showed degenerative disc disease; further, Claimant explained he had no treatment for his back because he did not like going to the doctor and did not want surgery. (<u>Id</u>. at 14-16.) Claimant does not argue that he cannot perform sedentary or light level work, but does contend he is unable to perform medium level work, and because of his age and education, he would be entitled to disability benefits. (<u>Id</u>. at 16.) Claimant prays for an entry of reversal and award for benefits, or remand to correct the errors complained of herein. (<u>Id</u>. at 16-17.)

In response, the Commissioner states the ALJ did properly evaluate Dr. McClellan's opinion pursuant to the Regulations, and further, the ALJ is not required to parse through every factor to justify the weight given to a treating physician's opinion, particularly because he gave good reasons for discounting her opinion because it was inconsistent with her treatment notes.

(Document No. 19 at 14-17.) Further, the Commissioner contends that the ALJ's finding Claimant's degenerative disc disease a non-severe impairment supported by the lack of evidence for treatment of same as well as the lack of evidence suggesting it was functionally limiting, and therefore not erroneous under the Regulations. (Id. at 17-19.) Even if the ALJ committed error by not finding Claimant's degenerative disc disease severe, the error is harmless, as the ALJ went on to the next steps in the sequential evaluation and accommodated Claimant's credible limitations in the RFC assessment, and therefore asks the decision be affirmed. (Id. at 19-20.)

In reply, Claimant argues that the ALJ's justification for the weight given to Dr. McClellan's opinion by relying on Claimant's activities of daily living, Dr. McClellan's treatment notes, and Ms. Gettman-Hughes's consultative examination report is not supported by substantial evidence. (Document No. 20 at 1-2.) Further, Claimant contends that the Commissioner provides post hoc analysis for the ALJ's shortcomings in his findings and conclusions and that he failed to provide the good reasons required under the Regulations when he did not give Dr. McClellan's opinion controlling weight. (Id. at 2-3.) Finally, Claimant states that the ALJ finding degenerative disc disease a non-severe impairment on the basis of lack of treatment is reversible error that is unsupported by substantial evidence when Claimant provided reasonable explanation for the lack of treatment as well as testimony on the limitations caused by his back issues; the evidence of record did not support the ALJ's finding Claimant was capable of performing medium level work. (Id. at 4-5.)

Analysis

Evaluating Treating Physician Opinion Evidence:

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is more likely to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. § 416.927(c)(2). A treating physician's opinion is afforded "controlling weight" if it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." Id. The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. Id.

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 416.927(c)(2)(i)-(ii) and (c)(3)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors.[15] Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. § 416.927(c)(2).

In this case, the ALJ reviewed Claimant's mental health records, from his emergency room visit for suicidal ideation in April 2011 to his treatment at the Prestera Center in the years that followed, through July 2014. (Tr. at 97.) The ALJ noted the evidence showed "no significant

---

[15] 20 C.F.R. § 416.927(c)(6) provides:

When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability program and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

increase in symptom acuity" and that Claimant reported that his medications generally helped his symptoms with adjustments. (Id.) Overall, the ALJ found that Claimant's mental health treatment benefitted him. (Id.) Nevertheless, the ALJ found that Claimant had limitations as a result of his mental impairments, but he was capable of performing the work prescribed in the RFC. (Tr. at 98.) The reasons given for this were: that Claimant's medications stabilized his symptoms; that he had not any emergency room visits or hospitalizations for mental health issues since the date of his application for SSI; that despite his allegations of inability to control his anger and behavior, there was no evidence of "altercations or inappropriate behavior towards others despite situational stressors (homelessness) and new environments (a new landlord and home)." (Id.) The ALJ also found that the RFC accommodates Claimant's moderate deficiencies in social functioning, concentration, persistence, and pace. (Id.)

The ALJ expressly gave "substantial weight" to the opinions provided by two state agency medical consultants, finding their opinions consistent with Claimant's treatment notes that indicated no "significant deficits in functioning or abnormal behaviors and with the consultative examination that showed no more than mild to moderate limitations in concentration, persistence, and pace, and social functioning." (Id.) Further, the ALJ noted their opinions supported Claimant's ability to perform the work prescribed in the RFC. (Id.) Regarding the October 2012 opinion by Ms. Gettman-Hughes, the ALJ gave it "less weight" because she found Claimant's mental impairments non-severe, and later evidence supported the moderate limitations in functioning described *supra*. (Id.)

At issue in this appeal, the ALJ explicitly gave "little weight" to Dr. McClellan's opinion[16],

---

[16] The ALJ cited this as Exhibit 11F, the Mental Assessment of Ability to Do Work-Related Activities Dr. McClellan provided in June 2014. (Tr. at 607-609.)

despite her status as "a treating source", because it was

> inconsistent with her treatment notes that fail to show any significant deficits in functioning, behavior, or interacting with others, [f]urther it is inconsistent with his activities of daily living that indicate he uses public transportation and reads, and was able to travel out of state and care for a family member. It is also inconsistent with the consultative examination findings. In addition, she failed to point to any objective findings, incidents of uncontrollable behaviors or inappropriate social interactions, or mental status evaluations that support such severe deficits in functioning, which makes her opinion unpersuasive.[17] (Id.)

Though the ALJ also assigned "little weight" to the GAF scores that were contained in the record, for being essentially based on a claimant's subjective complaints at a particular point in time, the ALJ noted that in this case, Claimant's scores indicated "generally mild deficits in functioning", though "considered with all the other evidence in determining the functioning of [Claimant] over an extended period." (Id.) Ultimately, the ALJ found "that the longitudinal evidence of record adequately supports the [RFC] determination[.]" (Tr. at 99.)

The undersigned finds that the aforementioned discussion outlined the ALJ's "good reasons" for giving Dr. McClellan's treating opinion less than controlling weight as mandated by the Regulations. The ALJ acknowledged her as Claimant's treating physician (Tr. at 98.); though he did not specifically reference her specialty, the ALJ acknowledged that Claimant received "mental health treatment" at the Prestera Center that contained Dr. McClellan's treatment notes for same. (Tr. at 97.) Moreover, the ALJ ostensibly acknowledged that Claimant had been in her

---

[17] Claimant takes issue with the ALJ's citing his use of public transportation, reading, and having traveled out of state to care for a family member was improper as those instances were not elicited during the hearing, but were taken from his application forms and the frequency of these activities were not established. (Document No. 16 at 13.) However, in his analysis of Claimant's credibility, the ALJ considered, in addition his statements in his application forms, Claimant's admission to the consultative examiner that he "brings food home from a restaurant twice a month, which indicates that he occasionally goes to public places". (Tr. at 95-96.) The ALJ found these activities to be inconsistent with Claimant's allegations that he had debilitating mental impairments or uncontrollable behaviors, and further, noted the absence of objective medical findings "that offer convincing support for him impairment-related claims." (Tr. at 96.)

care for his mental health conditions for several years, beginning after his emergency room visit in April 2011 through the date of the hearing. (Tr. at 95, 96, 97.) Most importantly, the ALJ explicitly found her medical source opinion that Claimant was more severely limited functionally due to his mental impairments unsupported by her own treatment notes and with the other evidence of record, and the ALJ provided examples of the inconsistencies he found in support of this finding. In sum, the undersigned finds that Claimant's argument on this ground lacks merit, and that the ALJ's evaluation of Dr. McClellan's opinion is supported by substantial evidence.

Determining Severe Impairment:

A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." See 20 C.F.R. § 416.920(c); see also Id. § 416.921(a). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." Id. § 416.921(b). The Regulations provide examples of these activities: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. Id. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Claimant argues his degenerative disc disease warranted a finding by the ALJ to include it as a severe impairment at step two of the sequential analysis, and that the examination reports

provided by DDS consultative examiners, Drs. Nilima Bhirud and Kip Beard, as well as the x-ray Dr. Beard ordered for his lumbar spine, support such a finding. (Document No. 20 at 4; Tr. at 404-409, 456-464.) The ALJ briefly addressed the aforementioned evidence in his written decision, but noted several times that the record contained no evidence of treatment for Claimant's back problems.[18] (Tr. at 95, 96, 97.) Further, the ALJ noted Claimant's reasons for not having treatment on his physical impairment: "the claimant stated that he does not like to see doctors[.]" (Tr. at 96.) The ALJ reconciled this stance with Claimant's ongoing mental health treatment, which he found to detract from the credibility of his allegations of severe symptoms from his physical impairments. (Id.) Most notably, however, the ALJ found that the record contained no objective findings and examinations supporting significant functional limitations. (Id.)

Regarding Dr. Bhirud's examination in 2012[19], the ALJ noted the doctor's findings that Claimant had received no treatment for his back pain, despite his allegations of years of back pain, had no physical therapy, had not used a pain clinic, or been seen by a neurosurgeon, and did not use an assistive device to ambulate. (Id.) The ALJ acknowledged Claimant exhibited "some reduced range of motion and tenderness of the spine and an inability to squat, but was otherwise normal." (Id.) Next, the ALJ addressed Dr. Beard's examination, which revealed Claimant had "no difficulty in squatting and only mild spine abnormalities with some tenderness."[20] (Id.)

---

[18] The Commissioner contends, and the undersigned agrees, that in evaluating symptoms, including pain, various factors are considered, including the lack of treatment pursuant to 20 C.F.R. § 416.929(c)(3)(iv)-(vi). (Document No. 19 at 18.)

[19] It is noted that the ALJ did not refer to Dr. Bhirud by name, but referenced the "consultative examination in 2012" and cited it as "Exhibit 2F". (Tr. at 96.)

[20] Again, the ALJ did not refer to Dr. Beard by name, but referenced the "consultative examination in 2013" and cited it as "Exhibit 6F". (Id.) The undersigned notes that the only records available to Dr. Beard at the time of his consultative examination was the assessment by Dr. Bhirud. (Tr. at 459.)

Finally, the ALJ acknowledged that the "imaging of the lumbar spine does not show any nerve root compression or myopathy." (Id.)

The lack of medical treatment for his back pain, coupled with the absence of any emergency room visits or hospitalizations for pain, led the ALJ to conclude that Claimant's pain "is not as severe as he alleges", and furthermore, that Claimant was "capable of the limited range of medium exertional work activity prescribed in the [RFC], which fully accommodates his physical impairments and symptoms." (Tr. at 96-97.) The ALJ also noted that the opinions provided by state agency medical consultants support the conclusion that Claimant was able to perform medium exertional work activity, as they were consistent with other medical opinions, consistent with the lack of treatment, and consistent with the consultative examinations. (Tr. at 97.) The ALJ gave all those opinions "great weight", but "less weight is given to the opinion of the consultative examiner in 2012 that also found postural limitations, as later evidence does not support these (Exhibit 1A)."[21] (Id.)

Despite Claimant's diagnosis of degenerative disc disease, confirmed by the x-ray taken on January 8, 2013 (Tr. at 463.), the record does not support the critical evidence of a corresponding functional limitation that allows for a finding that it is a "severe impairment" under the Regulations cited supra. Further, the diagnosis of degenerative disc disease does not alone translate into disability where there has been no evidence to substantiate a related functional loss preventing Claimant from work. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986).

---

[21] The undersigned notes that Dr. Bhirud performed his examination on February 1, 2012, and another state medical consultant, Dr. Dominic Gaziano, reviewed his evaluation, along with the other evidence of record at that time, on February 10, 2012, at the initial level of review. (Tr. at 145-154.)

Accordingly, the undersigned finds the ALJ's rejecting Claimant's degenerative disc disease as a severe impairment supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 16.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 19.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of

such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate

Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and

to send a copy of same to counsel of record.

ENTER: February 17, 2017.

Omar J. Aboulhosn
United States Magistrate Judge